

## Fourth Court of Appeals
### San Antonio, Texas

**MEMORANDUM OPINION**

No. 04-24-00397-CV

**IN THE INTEREST OF I.J.M.**, L.M.M., A.F.M., and E.M.M., Children

From the 150th Judicial District Court, Bexar County, Texas
Trial Court No. 2023-PA-00332
Honorable Kimberly Burley, Judge Presiding

Opinion by:     Luz Elena D. Chapa, Justice

Sitting:          Luz Elena D. Chapa, Justice
                  Beth Watkins, Justice
                  Liza A. Rodriguez, Justice

Delivered and Filed: December 11, 2024

AFFIRMED

Appellant X.M. appeals the trial court's order terminating her parental rights to I.J.M., L.M.M., A.F.M., and E.M.M.[1] She challenges the sufficiency of the evidence to support the trial court's best-interest finding as to the children. We affirm.

### BACKGROUND

The Department of Family and Protective Services filed an original petition on March 8, 2023, seeking appointment as the children's temporary managing conservator and termination of

---

[1] To protect the identity of the minor children, we refer to appellant and her children by their initials. *See* TEX. FAM. CODE § 109.002(d); TEX. R. APP. P. 9.8.

X.M.'s parental rights.[2] The case proceeded to a two-day bench trial on June 3 and June 7, 2024, consisting of testimony from four witnesses and one exhibit, the family service plan. After hearing the evidence, the trial court found the Department established by clear and convincing evidence the grounds for termination of X.M.'s parental rights as to the children pursuant to subsections (O) and (P). *See* TEX. FAM. CODE § 161.001(b)(1)(O), and (P). It further found by clear and convincing evidence terminating X.M.'s parental rights was in the children's best interest.[3] *See id.* § 161.001(b)(2). Based on its findings, the trial court appointed the Department as the children's permanent managing conservator.

X.M. timely appealed the trial court's order. On appeal, X.M. challenges the trial court's best-interest finding.

## LEGAL AND FACTUAL SUFFICIENCY OF THE EVIDENCE TO SUPPORT THE TRIAL COURT'S BEST INTEREST FINDING

X.M. argues the evidence is legally and factually insufficient to establish termination of her parental rights was in the children's best interest.

### A. Standard of Review

A parent-child relationship may be terminated, pursuant to Texas Family Code section 161.001, only if the trial court finds by clear and convincing evidence one predicate ground enumerated in subsection (b)(1) and termination is in a child's best interest. TEX. FAM. CODE § 161.001(b)(1)–(2); *see, e.g.*, *In re C.E.*, 687 S.W.3d 304, 308 (Tex. 2024). Clear and convincing evidence requires proof that will produce in the factfinder's mind "a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE § 101.007. To determine if this heightened burden of proof is met, we employ a heightened standard of review by judging

---

[2] The Department also sought termination of the parental rights of the children's father.

[3] The trial court made the same findings as to the children's father, but he is not a party to this appeal.

whether a "factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations." *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). This heightened standard "guards the constitutional interests implicated by termination, while retaining the deference an appellate court must have for the factfinder's role." *In re O.N.H.*, 401 S.W.3d 681, 683 (Tex. App.—San Antonio 2013, no pet.). Under this standard, the factfinder is the sole judge of evidentiary weight and credibility, including witness testimony. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009). We do not reweigh witness credibility issues, and we "defer to the [factfinder's] determinations, at least so long as those determinations are not themselves unreasonable.'" *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (quoting *Sw. Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 625 (Tex. 2004)).

"When reviewing the sufficiency of the evidence, we apply the well-established [legal and factual sufficiency] standards." *In re J.M.G.*, 608 S.W.3d 51, 53 (Tex. App.—San Antonio 2020, pet. denied) (alteration in original) (quoting *In re B.T.K.*, No. 04-19-00587-CV, 2020 WL 908022, at *2 (Tex. App.—San Antonio Feb. 26, 2020, no pet.) (mem. op.)) (internal quotation marks omitted). "When reviewing whether the evidence is legally sufficient to support termination of parental rights, we 'view the facts in a light favorable to the findings of the trial judge, who heard the testimony, evaluated its credibility,' and dealt the closest with the evidence at hand." *In re R.R.A.*, 687 S.W.3d 269, 276 (Tex. 2024) (quoting *In re J.F.-G.*, 627 S.W.3d 304, 315 (Tex. 2021)). "An appellate court 'cannot substitute [its] judgment for the factfinder's' when considering the credibility of the evidence presented." *Id.* (alteration in original) (quoting *J.F.-G.*, 627 S.W.3d at 316). "[T]he appellate standard for reviewing termination findings is whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations." *Id.* (alteration in original) (quoting *C.H.*, 89 S.W.3d at 25) (internal quotation marks omitted). We must assume the factfinder resolved disputed facts in favor of its finding if a

reasonable factfinder could do so, and we do not disregard undisputed evidence even if it does not support the trial court's finding. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). "Courts 'should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible.'" *C.E.*, 687 S.W.3d at 308 (quoting *J.F.C.*, 96 S.W.3d at 266). In our factual sufficiency review, we consider the entire record and determine whether, in light of the entire record, any disputed evidence "is so significant that a factfinder could not reasonably have formed a firm belief or conviction" on the challenged finding. *J.F.C.*, 96 S.W.3d at 266.

### B. The Best Interest of the Children

#### 1. Law

Under Texas law, "there is a strong presumption that the best interest of a child is served by keeping the child with a parent." *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam). However, a trial court must also presume "the prompt and permanent placement of the child in a safe environment is . . . in the child's best interest." TEX. FAM. CODE § 263.307(a). In making a best-interest determination, the factfinder looks at the entire record and considers all relevant circumstances. *See C.H.*, 89 S.W.3d at 27–29.

In determining a child's best interest, a trial court should consider the factors set out in Texas Family Code section 263.307 and the non-exhaustive *Holley* factors.[4] *See Holley v. Adams*,

---

[4] Section 263.307(b)'s factors include: the child's age and physical and mental vulnerabilities; the frequency and nature of out-of-home placements; the magnitude, frequency, and circumstances of the harm to the child; whether the child has been the victim of repeated harm after intervention by the department; whether the child is fearful of returning to the child's home; the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home; whether there is a history of abusive conduct by the child's family or others who have access to the child's home; whether there is a history of substance abuse by the child's family or others who have access to the child's home; the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; whether the child's family demonstrates adequate parenting skills; and whether an adequate social support system consisting of an extended family and friends is available to the child. *See* TEX. FAM. CODE § 263.307(b).

544 S.W.2d 367, 371–72 (Tex. 1976). Those factors include: (1) the child's desires; (2) the child's present and future emotional and physical needs; (3) the present and future physical danger to the child; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the child's best interest; (6) the plans held by the individuals seeking custody; (7) the stability of the home of the parent and the individuals seeking custody; (8) the parent's acts or omissions indicating the existing parent-child relationship is not proper; and (9) any parental excuse for the acts or omissions. *Id.* The Department does not have to prove every factor for a trial court to find termination is in the child's best interest. *C.H.*, 89 S.W.3d at 27.

In our review of the trial court's best-interest findings, we must consider "the totality of the circumstances in light of the *Holley* factors" to determine whether sufficient evidence supports the challenged finding. *In re B.F.*, No. 02-07-334-CV, 2008 WL 902790, at *11 (Tex. App.—Fort Worth Apr. 3, 2008, no pet.) (mem. op.). Additionally, "[a] trier of fact may measure a parent's future conduct by his past conduct and determine whether termination of parental rights is in the child's best interest." *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied).

### 2. Analysis

#### a. The Desires of the Children

The Department caseworker Nicholas Reglein testified that at the time of trial I.J.M. was twelve years old, L.M.M. was ten years old, A.F.M. was four years old, and E.M.M. was two years old. The Department unsuccessfully attempted to place all four children together with family members. It spoke with X.M.'s adoptive father, who denied placement, and a previous placement for the children was unable to take the children. Several other family members declined to return Reglein's calls and some hung up on Reglein. Nevertheless, the Department found homes for three

of the children, but did not find a home for I.J.M. Reglein testified the children are "doing very well."

Both I.J.M. and L.M.M. indicated they would like to return to their parents. Reglein however testified it was in the best interest of all the children for the Department to proceed with finding permanent homes for them in an effort to prevent their development being impaired by X.M. At the time of trial, I.J.M. was living at the Thomas Rose Residential Treatment Center (RTC). There were no current plans to have I.J.M. moved with his siblings after he had completed services at the RTC. However, a potential foster placement was located for him, and the Department planned to conduct a pre-placement visit with I.J.M. and the potential foster parents. Reglein visited I.J.M. at RTC two weeks prior to trial. Reglein testified I.J.M. was "doing very, very well" and had shown a lot of improvement with minimal reports involving behavioral outbursts. I.J.M. did engage in a fight at school and threatened someone, but since then, he has improved regulating his emotions. I.J.M. also has received excellent grades, and a recent I.Q. test showed he has a very high I.Q.

Also voicing she had preferred to return home with her parents, L.M.M. did ultimately say she was okay with adoption. L.M.M. had been living in a foster home without her siblings; she was "doing very well," but she did scream, had emotional outbursts, and at times, she demonstrated an inability to de-escalate her emotions. However, she was engaged in therapy, working on her coping skills, and was doing well in school. She was also bonded with her caregivers, who do want to adopt her.

When children are too young to express their desires like A.F.M. and E.M.M., the factfinder may consider whether the child has bonded with caregivers, is well-cared for by them, and has spent minimal time with a parent. *See In re N.J.D.*, No. 14-17-00711-CV, 2018 WL

650450, at *6 (Tex. App.—Houston [14th Dist.] Feb. 1, 2018, pet. denied) (mem. op.). A.F.M. and E.M.M. are placed together in a foster home. Reglein testified they are "doing very well," "happy and content," and bonded with their caregivers who wish to adopt them. Reglein believed it was in their best interest to remain with their caregivers.

Reglein testified X.M. attended visits with the children on a regular basis, which were almost exclusively via Zoom because the children were living in Houston. Reglein further testified that during the visits X.M. engaged with the children and talked to them. But during some visits, X.M. did discuss the children's things being auctioned off, details of her eviction, and the loss of family vehicles; this upset the children. And there were concerns about the children having heightened emotions and acting out after visits.

X.M. testified she attended all her visits except for a few she missed because of work. She testified she brought those absences to the caseworker's attention, and most of the missed visits were the result of cancellations by the Department or the foster parents. There were also occasions when she could not visit the children: when I.J.M. was under psychiatric care and when L.M.M. had experienced an anxiety attack resulting from a school incident. Victoria Caylor, a licensed professional counselor who was counseling X.M., testified she believed X.M. loved her children, but she conceded she never saw X.M. with them.

### b. The Present and Future Emotional and Physical Needs of the Children

Reglein testified the children had various emotional and physical needs. He testified the Department received its intake on March 3, 2023, after it received reports I.J.M. was having suicidal ideations. I.J.M. was now taking medication in connection with his behavioral challenges. X.M. testified she was aware I.J.M. had certain mental health challenges, and she believed she could address them.

Reglein testified A.F.M. and E.M.M. were both engaged in speech therapy. He testified A.F.M. was making progress and was now conversant, but E.M.M.'s speech was delayed. A.F.M. also received specialized skills therapy, and the Department was concerned about A.F.M.'s teeth. Reglein and X.M. both testified X.M. initially had a vehicle for transportation, but later she had to use public transportation. X.M. testified she believed public transportation was a sufficient means of transportation for the children's appointments.

### c. The Physical and Emotional Danger to the Children

Regarding present and future danger to the children, the evidence shows X.M. was subject to domestic violence and threats of domestic violence. "Domestic violence may be considered in analyzing the best interest of the child." *In re N.M.R.*, No. 04-22-00032-CV, 2022 WL 3640223, at *7 (Tex. App.—San Antonio Aug. 24, 2022, pet. denied) (mem op.); *see, e.g.*, *In re K.V.C.*, No. 04-22-00150-CV, 2022 WL 3639511, at *5–6 (Tex. App.—San Antonio Aug. 24, 2022, pet. denied) (mem. op.) (reasoning evidence showing parents were unable to break cycle of domestic violence supported best interest finding); *see also* TEX. FAM. CODE § 263.307(b)(7); *Holley*, 544 S.W.2d at 371–72.

Here, the evidence shows the Department opened its investigation, in part, due to domestic violence. X.M. reported to the Department that at the beginning of the case the children's father dragged her with his truck after an argument. There was a separate incident in which X.M. and the children's father argued over his suspicion of X.M. cheating, and the children's father threatened to kill her, himself, and the other individual. X.M. conceded there had been domestic violence between her and the children's father, which she testified commenced when the Department became involved with their family. She further testified it had been "a good while" since the last domestic violence incident, and there were times when their relationship was "amazing." Reglein

testified X.M. and the children's father appeared cordial with one another in person, but he did not believe X.M. addressed the Department's concerns about domestic violence.[5]

The Department also produced evidence showing its concern about X.M.'s substance use disorder with methamphetamines and her directly exposing at least one of the children to methamphetamines. "Evidence of a parent's unstable lifestyle, including habitual drug and alcohol use, can support the conclusion that termination is in the child's best interest." *In re F.M.*, No. 14-18-00384-CV, 2018 WL 4925127, at *7 (Tex. App.—Houston [14th Dist.] Oct. 11, 2018, pet. denied) (mem. op.); *see* TEX. FAM. CODE § 263.307(b)(8) (providing as one factor whether there is history of substance abuse by child's family or others who have access to child's home); *see also In re J.S.*, 675 S.W.3d 120, 133 (Tex. App.—Dallas 2023, no pet.) (concluding evidence both legally and factually sufficient to conclude termination of parental rights in best interest where, among other things, child suffering from painful withdrawal symptoms from exposure to methamphetamines); *In re A.J.D.-J.*, 667 S.W.3d 813, 824 (Tex. App.—Houston [1st Dist.] 2023, no pet.) (concluding record contained significant evidence of parental indifference supporting termination was in child's best interest when child came into Department's care because both the mother and child tested positive for marijuana when child was born).

Reglein testified X.M. was subject to multiple Department investigations as far back as 2007, with the majority relating to her methamphetamine use. Nevertheless, X.M. engaged in intermittent methamphetamine use for the duration of the case. During the initial investigation, the investigator took L.M.M.—then-nine years old—to the hospital where she tested positive for methamphetamines, which resulted in the removal of the children.

---

[5] Reglein testified X.M. and the children's father had an on-again off-again relationship, but at the time of trial, Reglein was not sure as to the status of their relationship. X.M. testified she and the children's father had been together for thirteen years but were separated.

X.M. testified she had been using methamphetamines on and off throughout the current case, including approximately a week-and-a-half before trial. She further testified she had a span of six or seven months of sobriety during the case. She knew her recent drug tests were positive for methamphetamines, and she told her caseworker to expect that result.[6] She agreed her substance use disorder was dangerous for her children, and she "[could not] guarantee" she would not relapse. She testified she could only own up to her mistakes, and she knew she was a good mom.

The Department arranged for X.M. to attend inpatient treatment for her substance use disorder. Reglein testified he provided her with inpatient resources multiple times and agreed to take her to any subsequent inpatient programs. X.M. attended inpatient treatment beginning in October 2023, but she discharged herself two weeks later. X.M. attended outpatient treatment with Alpha Home beginning in May 2023. Reglein testified Alpha Home discharged her after five days for testing positive for drugs.

X.M. eventually completed an outpatient program in February 2024—a little more than three months before trial. X.M. appeared to maintain sobriety from October 2023 to March 2024 before again relapsing. Nevertheless, X.M. testified she believed outpatient treatment was sufficient to meet her needs. As support, she noted a week before trial, she moved into Casa Mia, which helps with substance use disorder by performing random drug testing. And she explained that if she tested positive, she would lose her home at that facility. She also liked she could have her two smallest children live with her and still work. She testified to overcome her addiction, she was also seeking psychiatric help and prescribed medication for treatment of her suppressed

---

[6] X.M. conceded her most recent positive drug test showing a high concentration of methamphetamines may have been related to her method of use: snorting.

feelings.[7] However, X.M. also appeared to still maintain ties with the children's father, including using methamphetamines with him a week-and-a-half before trial.

### d. X.M.'s Parental Abilities

X.M. conceded she had been involved with Child Protective Services (CPS) on multiple occasions since 2007. In 2007, her oldest child was removed because of substance use disorder on the part of the child's father. She testified she complied with her requirements, but she was nevertheless tricked into giving up her rights to that child. She was involved with CPS again in 2015, but her children were returned to her after she successfully finished outpatient treatment for a substance use disorder.[8] The children's father testified CPS was also involved with the family in 2022. X.M. conceded she has had many chances to prove she was a good mother.

### e. The Programs Available to Assist X.M. to Promote the Best Interest of the Children

Additionally, the trial court heard testimony X.M. did not complete her family service plan, and such evidence is probative of the children's best interest. *See, e.g.*, *In re B.R.T.*, No. 04-22-00416-CV, 2023 WL 29381, at *6 (Tex. App.—San Antonio Jan. 4, 2023, no pet.) (mem. op.). Reglein testified he provided X.M. with a family plan, outlining all the things she was required to do and went over the plan with her. He testified he had no concern about whether she understood the plan. He further testified he made all necessary referrals so X.M. could engage in the plan. X.M. was required to engage in substance use disorder services, domestic violence services, individual therapy, family therapy, parenting classes, a psychological evaluation, and a psychiatric assessment. She was also required to maintain stable employment and housing. He further testified

---

[7] Caylor testified X.M. struggled with substance use disorder, in part, as a form of self-medication, and these struggles posed a danger to her children.

[8] It is unclear from the testimony if those children included I.J.M. and L.M.M.

he continued to meet with X.M. and follow up on her services and ensure referrals were made. Reglein testified X.M.'s most important services were those addressing her substance use disorder.

Caylor testified she first met with X.M. on September 5, 2023 to conduct a psychosocial evaluation. Based on the evaluation, Caylor recommended X.M. take parenting classes, domestic violence classes, substance use disorder classes, individual counseling, as well as a psychological and/or psychiatric assessment. X.M. missed the next two appointments with Caylor, and Caylor discharged her. She testified X.M. thereafter went into inpatient rehabilitation. Caylor next enrolled X.M. in services in January 2024, including counseling to work through X.M.'s challenges with depression, anxiety, PTSD, poor decision-making, lack of accountability, parenting, domestic violence, and substance use disorder. Substance use disorder was her biggest challenge. Caylor believed without getting professional care, X.M. was incapable of controlling her depression and anxiety and would continue to struggle with substance use disorder. Through March 2024, she attended six of those sessions and missed a session in April 2024.[9] Caylor never heard from X.M. again. During the six sessions, Caylor observed little to no progress from X.M.[10] Caylor discharged X.M. after giving her a little more than thirty days to re-engage. Caylor believed X.M. was as honest as she was capable of during the sessions. Caylor had no knowledge of whether X.M. was ever able to use the coping skills she attempted to teach her. X.M. testified she struggled with counseling in the beginning because of her addiction. She testified she had to miss a session because it conflicted with a trial court date and when she reached back out to Caylor, she did not hear back.

---

[9] X.M. testified similarly.

[10] Reglein testified similarly. Reglein testified Caylor contacted him after X.M.'s initial assessment and provided him with therapy notes throughout the case.

X.M. did not engage in parenting classes until December 2023—eight months after the children were removed. However, X.M. testified Casa Mia was providing her with parenting classes, and she successfully completed them. The Department arranged for X.M. to complete a domestic violence course with Mitchell Moon with Family Violence Prevention Services, but X.M. had not completed a domestic violence course and had not engaged since January 2024. X.M. testified she started domestic violence classes there in the past week through Family Violence Prevention Services. She testified she engaged in counseling on family violence "on and off." She testified she learned to recognize a "toxic" environment and to "have a more safe life."

X.M. completed her psychological assessment, psychiatric assessment, and a parenting program. Reglein testified, however, her compliance with the plan was "noncompliant," and the Department was requesting termination of X.M.'s parental rights. X.M. requested "one more chance to prove" she deserved to parent her children. She did not expect the Department to return her kids immediately, conceding she needed to "earn" it.

### f. Stable Housing and Employment

Reglein testified that other than X.M.'s week at Casa Mia, X.M. did not maintain stable housing. The last home Reglein was aware X.M. had was an apartment in September 2023—approximately eight months before trial. There were concerns about the apartment. Although it had space for the children, the living conditions were not good, with a lot of trash and debris. It was unsafe for the smallest child, E.M.M., because the apartment had not been cleaned. He further testified X.M. stayed in hotels and with friends.[11] X.M. testified she found housing hard to maintain on her own because the children's father was struggling to find a job. However, X.M testified Casa Mia would allow the two smallest children A.F.M. and E.M.M. to live with her. She

---

[11] X.M.'s own testimony about her housing circumstances were similar.

noted Casa Mia could also "refer" her to an apartment complex, which would still qualify as a Casa Mia apartment. X.M. believed the children were capable of living with her under those circumstances.

At the time of trial, X.M. was employed and had been verifiably employed throughout the case. X.M. testified she worked for Premium Wireless and OnStage.

### g. Summary

Here, viewing the evidence in a light favorable to the trial court's findings, we conclude the trial court could have reasonably formed a firm belief or conviction termination of X.M.'s parental rights was in the best interest of her children. *See R.R.A.*, 687 S.W.3d at 276; *J.F.C.*, 96 S.W.3d at 266. Specifically, the trial court could have reasonably formed a firm belief or conviction, even though X.M. loved her children and attended visits with them, the children were well-cared for by others, and the Department had long-term adoption options for three of the children, and potentially for I.J.M. *See N.J.D.*, 2018 WL 650450, at *6. The trial court could have also reasonably formed a firm belief or conviction the children's long-term developmental challenges, including speech therapy, were better managed by their current caregivers. The trial court could have also reasonably formed a firm belief or conviction X.M. was emotionally and physically dangerous to the children because of her substance use disorder history, her inability to maintain sobriety after completing outpatient treatment, her daughter L.M.M.'s positive drug test for methamphetamines, and X.M.'s willingness to maintain a relationship with the children's father after their domestic abuse history. *See E.D.*, 419 S.W.3d at 620 (providing "trier of fact may measure a parent's future conduct by his past conduct and determine whether termination of parental rights is in the child's best interest"). The trial court could have also reasonably formed a firm belief or conviction X.M. had multiple opportunities to demonstrate her parental abilities to

the Department but was unable to do so. *See id.* In addition, the trial court could have reasonably formed a firm belief or conviction that although X.M. maintained stable employment, she was unable to maintain a stable home for her and the children, particularly because her Casa Mia residence depended upon her remaining drug free. Finally, the trial court could have reasonably formed a firm belief or conviction that despite X.M. having completed her psychological assessment, psychiatric assessment, and a parenting program, she did not complete her services in her family service plan, including inpatient treatment for her substance use disorder, domestic violence services, individual therapy, and family therapy.

We further conclude any disputed evidence, when viewed considering the entire record, could have been reconciled in favor of the trial court's best-interest finding and was not so significant the trial court could not have reasonably formed a firm belief or conviction termination was in the children's best interest. *See J.F.C.*, 96 S.W.3d at 266. We therefore hold the evidence is legally and factually sufficient to support the trial court's best-interest finding. *See* TEX. FAM. CODE § 161.001(b)(2).

**CONCLUSION**

We affirm the trial court's order.

Luz Elena D. Chapa, Justice
